# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| **CHRISTINE B. COLLINS, Independent Administrator of the Estate of ROBERT L. COLLINS, Deceased, et al.,** ) ) ) ) | No: 03 C 2958 |
| **Plaintiffs,** ) ) | Judge John W. Darrah |
| ) | *consolidated with* |
| **v.** ) ) | No. 03 C 2966 |
| **THE UNITED STATES OF AMERICA,** ) ) | No. 03 C 2998 |
| ) | No. 03 C 3162 |
| **Defendant.** ) | No. 03 C 3166 |

## OPINION AND ORDER

On February 8, 2000, two small airplanes collided midair while approaching the Waukegan

Regional Airport ("WRA"). Three persons were killed in the collision: Robert Collins and

Herman Luscher, the pilot and passenger of a Zlin airplane, respectively; and Sharon Hock, a student

pilot and sole occupant of a Cessna airplane. The Zlin aircraft caused property damage when it

subsequently crashed into a building housing the Cancer Treatment Centers of America, Midwestern

Regional Medical Center ("Midwestern Medical Center"), and Patient First, S.C.

On March 2, 2003, Christine B. Collins, as Independent Administrator of the Estate of

Robert Collins, filed suit against the United States of America, pursuant to the Federal Tort Claims

Act, 28 U.S.C. § 2671, *et seq.* ("FTCA") (Case No. 03 C 2958). That same day, Risé L. Barkhoff,

Individually and as Special Administrator of the Estate of Herman Luscher, filed suit against the

United States, pursuant to the FTCA (Case No. 03 C 2966). On May 5, 2003, Edward J. Hock, as

Independent Administrator of the Estate of Sharon Hock, filed suit against the United States,

pursuant to the FTCA (Case No. 03 C 2998). On May 12, 2003, Cancer Treatment Centers,

Midwestern Medical Center, Patient First, and Employers Insurance of Wausau (collectively, "Cancer Treatment Centers"), filed suit against the United States, pursuant to the FTCA (Case No. 03 C 3162). That same day, Aviation Training Enterprises of Illinois, Inc., d/b/a American Flyer (Hock's pilot school); ATE of New York, Inc.; and Scott Chomicz, an employee and flight instructor, (collectively, "American Flyers") filed suit against the United States, pursuant to the FTCA (Case No. 03 C 3166). In July 2003, the five suits were consolidated pursuant to Federal Rule of Civil Procedure 42(a).

Multiple lawsuits were also filed in the state court of Illinois (the "State cases"). The Estate of Collins sued American Flyers, Midwest Air Traffic Control Services, Inc. ("Midwest") (the contract operator of the Waukegan Regional Airport Control Tower) , and the Estate of Hock. The Estate of Luscher sued American Flyers, Midwest, the Estate of Collins, and the Estate of Hock. The Estate of Hock sued American Flyers, Midwest, the Estate of Luscher, and the Estate of Collins. Cancer Treatment Centers sued American Flyers, Midwest, the Estate of Hock, and the Estate of Collins. Five individuals that were injured on the ground when the aircraft crashed into the Cancer Treatment Centers – Crystal Andrews, Carolyn Anazalone, Christine Manoyan, Stanislaw Maravilla, and Dorian Simmons (collectively, "the Ground Plaintiffs") – sued American Flyers, Midwest, the Estate of Collins, the Estate of Luscher, and the Estate of Hock. In January 2004, Midwest and Gregory Fowler, the air-traffic controller employed by Midwest at the time of the collision, were allowed to intervene as Defendants in the instant case. In addition, on American Flyers' motion, the State parties and claims were joined with the instant case.

2

In November 2005, several parties reached a settlement on multiple claims, as follows: (1) the Estate of Luscher settled its claims against the Estate of Hock and the Estate of Collins for the amount of $450,000; (2) the Estate of Collins settled its claims against the Estate of Hock and the Estate of Luscher for the amount of $240,000; (3) the Estate of Hock settled its claims against the Estate of Luscher and the Estate of Collins for the amount of $410,000; (4) Maravilla settled his claims against the Estate of Hock, the Estate of Luscher, and the Estate of Collins for the amount of $175,000; (5) Anazalone settled her claims against the Estate of Hock, the Estate of Luscher, and the Estate of Collins for the amount of $62,000; (6) Simmons settled her claims against the Estate of Hock, the Estate of Luscher, and the Estate of Collins for the amount of $5,000; (7) Andrews settled her claims against the Estate of Hock, the Estate of Luscher, and the Estate of Collins for the amount of $18,000; (8) Manoyan settled her claims against the Estate of Hock, the Estate of Luscher, and the Estate of Collins for the amount of $90,000; and (9) and Cancer Treatment Centers settled their claims against the Estate of Hock, the Estate of Luscher, and the Estate of Collins for the amount of $550,000.

In April 2006, several Plaintiffs reached a settlement with American Flyers, as follows: (1) the Estate of Collins settled it claims against American Flyers for the amount of $300,000; (2) the Estate of Luscher settled its claims against American Flyers for the amount of $300,000; and (3) the Estate of Hock settled its claims against American Flyers for the amount of $300,000.

On February 5, 2007, the remaining Plaintiffs and Midwest filed an agreement between the parties. The agreement provided, in pertinent part that: (1) the Plaintiffs would obtain an order of non-suit, with prejudice, as to all claims against Fowler; (2) at the commencement of trial, Midwest would enter its declaration admitting liability in the causes against it; (3) Midwest would tender

3

$999,900 to the Court for distribution at the time of final judgment; (4) Midwest would not be required to appear and present any defense at trial; (5) the agreement was not intended to be a settlement, release, or covenant not to sue between the Plaintiffs and Midwest; (6) the Plaintiffs entered into the agreement with the specific intent to preserve all of their claims and/or theories of liability against the United States; and (7) if entering into the agreement is interpreted by any court to have waived or forfeited any of Plaintiffs' claims and/or theories of liability against the United States, the agreement would be null and void. On February 6, 2007, the Ground Plaintiffs dismissed all claims against Midwest; and all Plaintiffs dismissed their claims against Fowler.

That same day, a bench trial commenced. During the trial, the parties presented exhibits, deposition videos and transcripts of the testimony of witnesses, and the in-court testimony of witnesses, including expert witnesses. The Court and the parties also conducted a site visit of the WRA control tower during the hours of operation. The Court observed several airplanes approach the airport, land and take off, and also observed this activity as it appeared on the control-tower radar display known as TARDIS (Terminal Automated Radar Display and Information System). After the presentation of evidence in the bench trial concluded, a schedule for the parties' submission of written closing arguments and proposed findings of fact and conclusions of law was entered.

On March 8, 2007, the Court entered a Preliminary Order of Partial Findings as to several motions for judgment pursuant to Federal Rule of Civil Procedure 52C. The Court's Order further provided that the parties could file comments/objections to the Preliminary Order of Partial Findings on or before March 23, 2007. No objections were filed. The Court's March 8, 2007 Preliminary Order of Partial Findings is adopted and incorporated into the present Opinion and Order.

4

The parties have submitted post-trial written arguments and proposed findings of facts and conclusions of law. The Court has considered the evidence, including the testimony of the witnesses and exhibits, and has further considered the written arguments of counsel for the parties and the authority cited therein. The Court weighed the testimony of each witness and determined whether the testimony was truthful and accurate (in part, in whole, or not at all) and decided what weight, if any, to give to the testimony of each witness. In making this determination, the Court considered, among other things: the ability and opportunity the witness had to see, hear, or know the things about which the witness testified; the witness's memory; any interest, bias or prejudice the witness may have; the witness's intelligence; the manner of the witness while testifying; and the reasonableness of the witness's testimony in light of all of the evidence in the case. *See* Fed. Civ. Jury Instr. 7th Cir. §§ 1.13, 1.21 (2005).

Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following written Findings of Fact and Conclusions of Law, which are based upon consideration of all of the admissible evidence and this Court's own assessment of the credibility of the trial witnesses. To the extent, if any, that Findings of Fact, as stated, may be considered Conclusions of Law, they shall be deemed Conclusions of Law. Similarly, to the extent, if any, that Conclusions of Law, as stated, may be considered Findings of Fact, they shall be deemed Findings of Fact. The Decision section of this Opinion and Order, for purposes of organization and clarity, contains some reference to law and facts. To the extent, if any, that any part of the Decision may be considered Findings of Fact or Conclusions of Law, they shall be so deemed.

## FINDINGS OF FACT

### *The Operation of the Waukegan Regional Airport*

The Federal Aviation Administration ("FAA") is a federal agency of the United States Government. Pursuant to the Federal Aviation Act of 1958, as amended, the FAA is charged with the duty of ensuring the safety of aircraft flight. The Act authorizes and directs the Secretary of Transportation to provide necessary facilities and personnel for the protection and regulation of air traffic. The Secretary of Transportation is further authorized and directed to prescribe air traffic rules and regulations governing the flight of aircraft, the efficient utilization of navigable airspace, and the separation and prevention of collisions between aircraft.

The FAA is also responsible for the oversight, support, and guidance of FAA air-traffic control towers and federal contract air-traffic control towers. The federal contract air-traffic control towers are operated by private contractors pursuant to the FAA Contract Tower Program. The FAA Contract Tower Program Branch, located at the FAA headquarters in Washington, D.C., is responsible for the contract administration for more than 200 privately operated air-traffic control towers. Every contract air-traffic control tower operates under essentially the same contract.

Each contract tower is assigned to a hub facility, a larger air-traffic facility that is located in the area. The hub facilities report to a regional office. Hub managers are responsible for visiting all of the towers in their hub.

From an operational standpoint, the FAA headquarters' control of a contract tower and a FAA tower is the same. The same mechanisms are in place to control a contract tower that are in place at a FAA tower. The FAA imposes the same directives on contract towers as it imposes on

6

its own facilities. The FAA officials' oversight responsibilities and responsibilities in providing equipment and services are the same at both a contract control tower and a FAA control tower.

The air-traffic control tower at WRA has been operated by a private contractor since it opened in 1989. Midwest has served as the private contractor for the air-traffic control tower at WRA from 1994 to the present. The most recent contract, No. DTFA01-94-C-0064, between the FAA and Midwest was executed on September 15, 1994.

On and before February 8, 2000, the FAA maintained extensive control over the day-to-day activities of the WRA Tower facilities. The contract provides that Midwest must comply with all procedures outlined in the documents, directives, and regulations required by the FAA to ensure the safe, orderly, and expeditious movement of air traffic. The standard operating procedures ("SOP") for the WRA Tower describe the day-to-day tasks that must be performed by a Midwest air-traffic controller. The SOP must be in compliance with FAA directives and regulations. For example, the SOP describe specific procedures for opening and closing the contract tower and how to rewind and store and replace recorder tapes of tower radio communications.

The contract provides that the FAA provide to Midwest all operational forms required by the documents, directives, and regulations required by the FAA. For example, the FAA provides FAA Form 7230-4, Daily Record of Facility Operations and FAA Form 3120-1, Training and Proficiency Record for completion by Midwest.

The contract specifies that Midwest shall provide staffing for the control tower in accordance with the staffing plan submitted by Midwest in the contract-bidding process. Any modifications to the staffing plan must be approved by the FAA prior to implementation. Midwest is also required to advise the FAA whenever a staffing change occurs or is forecasted to occur that may impact the

7

provision of the control tower services. The FAA reserves the right to assign FAA controllers for supplemental staffing if the FAA determines that such staffing is needed for special events.

The contract is subject to the Service Contract Act of 1965, as amended. Accordingly, The wages and fringe benefits of Midwest controllers are specified by the United States Department of Labor.

The contract requires that Midwest establish, document, and implement a facility training program for operational controllers. The training program is subject to FAA evaluation and must incorporate certain FAA regulations, FAA Orders, and applicable paragraphs of the FAA Terminal Instructional Program Guide.

The contract provides that the FAA provide FAA-owned or leased space suitable for the provision of air-traffic control services, administration and storage of supplies, equipment and records. The FAA is responsible for the maintenance, repair and upkeep of the FAA-owned space allocated to Midwest.

The contract provides that the WRA Tower's hours of operation are 0600-2200 (6:00 a.m. to 10:00 p.m.). The FAA reserves the right to adjust the operating hours, and any proposed changes to the operating hours must be submitted to the FAA for review and processing.

The contract provides that all air-traffic controllers and control tower supervisory personnel employed by Midwest must meet certain qualifications stipulated in the FAA Regulations, Part 65, Subpart B (excluding paragraph 65.46). The contract requires that Midwest provide "suitable personnel" for the performance of services required by the contract. "Suitable personnel" is defined in the contract as an individual who has passed a national Agency Check or National Agency Check

8

and Inquiries. Midwest is also required to give priority consideration for employment to former FAA controllers that are known to the contractor.

The contract requires Midwest to establish quality assurance, drug testing, and alcohol-misuse prevention programs. The quality assurance program must comply with FAA Orders 7210.3 and 7010.1. During the term of the contract, the FAA has the right to review/approve contractor-initiated changes to the contractor's operational directives, contingency plan, facility training program, quality assurance program, phase-in/phase-out plan, drug testing program, and alcohol-misuse prevention plan.

The FAA reserves the right to verify Midwest employee qualifications; and, in the event that the employee is determined by the FAA to be unacceptable, Midwest must immediately remove that person, upon written notice from the FAA contracting officer.

Per the contract, Midwest is responsible, without additional cost to the FAA, for obtaining all necessary licenses and permits. The contract also requires that Midwest maintain liability insurance in the amount of $1 million and that Midwest add the Government as an additional named insured on the policy. Midwest's insurance premium was charged back to the Government as part of the bid for the contract. Under the present contract, the Government provides the insurance for Midwest and Midwest's controllers. The Government also reimburses Midwest for the payment of worker's compensation insurance premiums.

The contract provides that the "FAA will conduct full-facility, followup, and in-flight/preflight evaluations at FCT [FAA contract tower] locations in accordance with FAA Order 7010.1." FAA Order 7010.1 provides that "AAT evaluation branches shall conduct at least two preflight evaluations annually on each AFSS [automated flight service station]/IAFSS [international

automated flight service station]/FFS [flight service station] within their area of responsibility." The contract requires Midwest to have a quality assurance program that included "provisions for internal full-facility evaluations and for written responses regarding corrective actions for any problems identified and/or remaining open as a result of an ATH [FAA Office of Air Traffic System Effectiveness] full-facility, followup, or in-flight/preflight evaluation." The FAA evaluations of the contract tower are based on checklists contained in FAA Order 7010.1. The general purpose of the evaluation is to verify and ensure that the contract tower is operating in accordance with FAA regulations and standards. The full facility evaluations are "normally" conducted once every two years at each air-traffic facility.

Per the contract, the FAA also provides Midwest "with all operational equipment required for the provision of ATC [air traffic control] and weather reporting services, such as: voice recorder, wind speed and direction readout, telecommunications equipment to operational positions with loudspeakers . . . ." The equipment provided by the FAA is also routinely maintained by the FAA, and the FAA has the right to modify existing equipment or install new or different equipment. Equipment installation, including radar displays such as TARDIS, at the control tower was/is completely controlled by the FAA.

*The Midair Collision*

WRA, at all relevant times, is located North-Northwest of Waukegan, Illinois, and has two runways. Runway 5-23 is 6,000 feet long and 150 feet wide, lies Northeast-Southwest; the extended centerline of runway 23 (the Northeast section) crosses the Lake Michigan shoreline about three-and-one-half miles to the Northeast. Runway 14-32 is 3,251 feet long and 75 feet wide and is positioned Northwest-Southeast. WRA is located within a Class D airspace, which extends up to 3,200 feet

10

mean sea level altitude. On February 8, 2000, the Waukegan Air-Traffic Control Tower was classified as a Visual Flight Rules ("VFR") Tower, also known as a "non-radar tower." WRA, like most non-radar towers, was then not equipped with a radar or radar display terminal for use by the air-traffic controllers. A terminal radar display is a screen mounted in a control tower cab (the glass-enclosed top of the tower) that allows an air-traffic controller to view a presentation of data from a nearby FAA radar facility.

On February 8, 2000, three Midwest employees were assigned to work in the WRA Tower: Gregory Fowler, George Edler, and Eunice Philbin-King. Philbin-King had been on duty from 6:00 a.m. to 2:00 p.m.

That afternoon, Robert Collins was solely in control of a Moravan Z242L (also known as a Zlin) airplane, registration number N5ZA, near WRA. The Zlin airplane is a low-wing (wings below the pilot), dual-control, single-engine aircraft. Herman Luscher was an occupant in the right seat of the Zlin. Sharon Hock was the only occupant and was in control of a Cessna 172P airplane, registration number N99063, at the same time, also near WRA. The Cessna 172P is a high-wing (wings above the pilot), dual-control, single-engine airplane. The Cessna 172P was owned and used for flight training by American Flyers and was based at Palwaukee Airport in Wheeling, Illinois. Hock was then a student pilot being trained by American Flyers.

Both airplanes were receiving air-traffic control services from Fowler, who was working on the local control position at the WRA Tower. The local controller communicates with airplanes on the ground, on the active runways, and airplanes in the air that are approaching and departing the airport. The local controller issues instructions to airplanes that take off or land at the airport, including advising airplanes when they are clear to land. Edler was working ground control. The

11

ground controller communicates with airplanes taxiing on the airport surface once they are off the active runways and issues taxi instructions.

At 2:55 p.m. local time, the surface weather observation taken at WRA showed clear skies, 10 miles visibility, temperature 33 degrees Fahrenheit, dew point 23 degrees Fahrenheit, wind 220 degrees at 17 knots, and altimeter setting of 30.19 inches of mercury.

Collins was flying south over Lake Michigan in the Zlin and intended to approach WRA and land on runway 23 from the Northeast. Hock was practicing taking off and landing in the Cessna on the same runway at WRA. This involved a standard traffic pattern that consists of: (1) a downwind leg (flying parallel to the runway in a direction opposite to the intended landing direction), (2) a ninety-degree turn to the base leg (in the direction of the runway), and (3) a final approach (along the extended runway centerline, to the point of touchdown). The standard base-leg turn for aircraft at the WRA was at a distance less than one mile from the approach end of the runway. Hock was flying a "right-hand" traffic pattern, making all turns to the right. Hock took off heading Southwest, then turned to fly a rectangular pattern which took her Northeast (the "right-downwind" leg) parallel to runway 23, then turning right to a Southeast (the right "base" leg), then a final right turn to a Southwest (known as a "final-approach" leg) to land on runway 23.

On February 28, 2000, Fowler was communicating on the Local Control radio frequency with both Collins and Hock. All airplanes on that frequency could hear the controller and one another. At 2055:25, Collins initially contacted the WRA Tower. At 2055:31, Collins contacted the WRA Tower, reporting that he was fifteen miles from the WRA. At 2055:34, Fowler asked Collins if he

was "coming down the shoreline."[1]  At 2055:36, Collins responded, "that's affirmative."  At 2055:38, Fowler ordered Collins to report turning final at the shoreline for the straight-in approach to runway 23.  At 2059:48 Fowler asked Collins' position.  At 2059:50, Collins responded that he was "just about a mile or two off the lake, ah, off the shoreline."  At 2059:55, Fowler told Collins to "keep your speed up as much as feasible, cleared to land."  At 2059:58, Collins responded "OK speed up cleared to land thanks."  At 2100:01, Collins reported "peddling as fast as I can."

At 2100:38, Fowler instructed Hock to "continue on the downwind advise when you see a red low wing aircraft straight in on final" (referring to the Zlin).  At 2100:44, Hock responded, "looking for traffic zero six three."[2]  At 2100:50, Collins corrected Fowler that his aircraft (the Zlin) was white.  At 2100:57, Fowler informed Hock that the aircraft will "be a white low-wing aircraft."  At 2101:00, Hock responded, "looking for the traffic zero six three."  At 2101:16, Hock contacted Fowler, indicating "negative traffic could you call my base please" (meaning, tell me when to turn right, ninety degrees in the direction of the runway).  At 2101:19, Fowler agreed to do so.

A third  aircraft was flying in the WRA traffic pattern at the time of the accident, a Cessna 172, Registration No. N52048, flown by Paul Pieri.  At 2101:29, Fowler instructed Pieri to "make a right three-sixty reenter on the downwind so you don't have to extend out so far."[3]

---

[1]The quoted dialogue is taken from the certified transcription of the recorded conversations without correction of any syntax errors.

[2]A pilot identifies an aircraft by the last three numbers of the registration number; Hock here is identifying her airplane, N99063, as originating the radio communication.

[3]Pieri was flying a left-hand traffic pattern on the opposite side of Runway 23 from Hock; Fowler instructed Pieri to make a maneuver so that his downwind leg would not require him to fly an over-extended distance from the tower.

At 2101:41, Fowler asked Collins, "what's your distance out now?" At 2101:43, Collins responded, "just crossing the shoreline." AT the time of this transmission, Collins was approximately 1.4 miles from the shoreline. At 2102:09, Fowler asked Hock if she saw the "Zlin out there yet." At 2102:11, Hock responded, "negative."

At 2102:12, Fowler asked Hock if she "passed the shoreline." At 2101:14, Hock responded, "gettin' there." At 2102:16, Fowler instructed Hock to "start your base leg now." That is, to make a ninety-degree right turn towards runway 23. At this time, Hock, actually, was closer to the airport than Collins; and when she turned right again on the final-approach leg, Hock was in front of and below Collins, not behind him as Fowler believed.

At 2102:47, Pieri contacted Fowler, "tower we have the Cessna." At 2102:51, Fowler responded, "whoever advised they have the Cessna in sight you were covered." At 2102:54, Pieri responded, "it's at five zero four eight we're back on the downwind and we have the landing traffic in sight." At 2102:59 Fowler asked, "is it the low wing or Cessna?" At 2103:03, Pieri responded, "it's the Cessna." At 2103: 04, Fowler ordered Pieri to "follow behind the Cessna you're number three."

At 2103:19, Collins contacted the tower, stating "negative contact with the Cessna in front of us." At 2103:22, Fowler responded, "you should be number one Bob." At 2103:24, Collins responded, "OK." At 2103:38, Fowler asked Hock to "advise when you turn final" (i.e., turned to the direction of the runway). At 2103:40, Hock responded, "zero six three on final." At 2103:53, Fowler asked Collins, "do you see a Cessna in front of you?" At 2104:00, Collins advised Fowler, "just had a midair."

Collins' Zlin airplane collided with Hock's Cessna airplane over a residential area of Zion, Illinois, approximately two miles from the approach end of runway 23 of the WRA. The leading edge of the Zlin's right wing struck the rudder (tail) of the Cessna. Collins was unable to see Hock's Cessna airplane below him because of the location of the (low) wings of the Zlin aircraft and Collins' position in the airplane above the wings and because of the weather conditions at the time of the collision, including severe glare from the angle of the sun and ground clutter[4] presented to Collins. Similarly, Hock was unable to see Collins' Zlin airplane above her because of the location of the (high) wings of the Cessna aircraft and Hock's position in the airplane below the wings.[5]

The Zlin then crashed into the roof of the Midwestern Medical Center, and the Cessna 172 crashed into the street. Both airplanes were destroyed; and both occupants of the Zlin (Collins and Luscher) and the single occupant of the Cessna 172 (Hock) were killed.

Collins, born February 28, 1942, held a private pilot certificate with a single-engine land airplane rating. At the time of his most recent FAA third-class medical certificate, Collins had reported 1,200 total flight hours, of which 150 had been flown in the six months prior to reporting.

---

[4]Ground clutter, as used here, refers to the terrain that may be seen from the aircraft. For example, when looking down from the aircraft, the pilot may see buildings, roads, and other surfaces that do not present sufficient contrast to readily determine the presence of an aircraft in the air when viewed from above. In the instant case, Plaintiffs presented expert testimony in this regard, including a demonstration involving a re-enactment of the position of the two airplanes shortly before the collision and photographs depicting the view from the airplane at a higher altitude, representing Collins' Zlin aircraft. This testimony and photographs showed that Collins' view of Hock's Cessna below was hindered because the location of the Cessna was masked when viewed against this background.

[5]Plaintiffs' expert and photographs taken during the re-enactment also supported this finding. The Government's expert witness's testimony to the contrary was not persuasive, and the Government provided no photographs to contradict the Plaintiffs' expert's testimony and photographs demonstrating the inability of Hock and Collins to see each other to avoid the midair collision.

Collins had received a biennial flight review of January 16, 2000. At the time of the accident, Collins was employed as a popular on-air performer with WGN radio. At the time of the accident, Collins was married to Christine B. Collins. Christine Collins was born June 18, 1955; and they were married on June 14, 1986. Collins had no children.

Collins had diabetes but did not disclose this to the FAA, as required by FAA regulations. Doctor Frank Weschler, Collins' personal physician since August of 1999, testified that Collins never complained of or exhibited any classic symptoms or impairments associated with diabetes. Collins' health did not affect his ability to fly, and there is no causal connection between Collins' failure to disclose his diabetes and the midair collision. An autopsy performed on Collins by the Lake County Coroner's Office found that Collins' cause of death was multiple traumatic injuries from the impact with the ground due to a midair small-plane collision.

Luscher was born on December 25, 1941. At the time of the accident, Luscher was retired from the military, where he had served in the U.S. Navy from May 1964 to October 1988. Luscher retired from the service as a Lieutenant Commander. At the time of the accident, Luscher was married to Risé Barkhoff. Barkhoff was born on March 19, 1951, and married Luscher on January 17, 1980. Luscher and Barkhoff had one child, Evan Luscher, born January 4, 1988. Luscher is survived by his wife and his son. An autopsy performed on Luscher by the Lake County Coroner's Office found that Luscher's cause of death was multiple traumatic injuries from the impact with the ground due to a midair small-plane collision.

Hock had begun her flight training as a student pilot on November 19, 1999, and had flown her first solo flight on January 14, 2000. Hock had a total of 35.8 hours of flight time as a student. Hock was born on January 6, 1969. At the time of the accident, Hock was employed as a flight

16

attendant at United Airlines. Hock is survived by her father, Edward Hock, born September 28, 1933, and her sister, Margaret Hock, born August 14, 1970. Hock had very close personal relationships with her father and sister, and they regularly enjoyed various activities together. Hock's most recent FAA flight physical was issued on December 18, 1999, with the limitation that she wear corrective lenses. Hock was in compliance with that limitation at the time of the accident. An autopsy performed on Hock by the Lake County Coroner's Office found that Hock's cause of death was multiple traumatic injuries from the impact with the ground due to a midair collision.

ATE of Illinois was in the business of operating and managing a pilot training school in Illinois on and before the date of the accident. ATE of Illinois registered with the Secretary of State to conduct business under the assumed name of American Flyers. American Flyers. was engaged in the business of operating and managing a pilot training school in Illinois. At the time of the accident, Scott Chomicz was a certified flight instructor with American Flyers, Inc. and ATE of Illinois.

Fowler was certified by the FAA as an air traffic control specialist. Fowler had previously worked in an FAA control tower as an FAA employee. His duties and responsibilities at the WRA Tower as an employee of Midwest were no different than when he worked as an FAA employee. Fowler received monthly training from the FAA.

On February 8, 2000, Fowler worked a control position in the tower cab for approximately seven hours and sixteen minutes without any relief break or meal break. Between 2:00 p.m. and 3:05 p.m on February 8, 2000, Fowler made or received approximately 416 radio transmissions or approximately one transmission every 8.65 seconds. Each transmission requires a "control-thought-process" of sequencing aircraft both in the air and on the ground.

Farrell Smith testified as an expert for the Plaintiffs. Smith worked for the FAA for over

thirty years in various positions, including supervisory positions that included supervising air-traffic controllers and as an area manager. Smith's responsibilities included evaluating FAA and contract towers. Smith's testimony was credible, unimpeached, and was consistent with and supported by other reliable and relevant evidence, including the series of transmissions between the pilots and Fowler.

Based on the testimony of Smith and other evidence, Fowler failed to safely separate Collins' Zlin airplane and Hock's Cessna airplane, as evidenced by the transmissions from both Collins and Hock; Fowler did not, at any relevant time, know the exact position of either aircraft in relation to the shoreline or to each other. Fowler allowed Hock to proceed too far from the control tower on her downwind leg and called Hock's base leg (i.e., directed her to turn right toward the runway in Collins' direction of flight) without knowing exactly where Collins and Hock were located and thereby put them on a collision course. Fowler failed to visually identify where both airplanes were from the control tower. Furthermore, when Fowler realized that he was unaware of the two aircrafts' positions, Fowler failed to issue a safety alert and order Collins and Hock to abort their landings, when he had the opportunity to do so.

FAA Order 7210.3 provides, in pertinent part:

> Relief periods
> a. Facility AT managers shall use all available qualified personnel to provide relief periods. First priority should be given to providing a reasonable amount of time away from the position of operation for meals.
>
> * * *
>
> Supervisors are also responsible for ensuring that relief periods are applied in a manner as to maximize the usage of personnel and to promote the efficiency of the agency.
>
> c. Relief period, i.e., break, is defined by the Comptroller General as

a "brief" rest period that may be assigned by the agency. While no specific timeframe is placed on the duration of relief periods, supervisors and managers will be held accountable to ensure that breaks are of a reasonable duration.

Smith also opined that because Fowler was in a control position for over seven hours without a break or relief period, fatigue would have been a contributing factor in making the improper decisions he made in providing air-traffic control services and/or instructions to Collins and Hock before the time of the collision. Furthermore, the FAA should reasonably have known that the air-traffic controllers at WRA were not taking breaks, as required by FAA Order 7210.3, through the FAA's receipt and review of time sheets of the WRA air-traffic controllers. Fowler's continued performance of his duties without a relief period and the FAA's failure to ensure that the air-traffic controllers at WRA, including Fowler, were taking mandatory breaks caused or contributed to the midair collision on February 8, 2000.

FAA Order 7010.1 describes the air-traffic evaluations of contract towers conducted by the FAA. The most recent full-facility evaluation by the FAA of WRA prior to the accident was conducted on August 24-25, 1999. The evaluation was conducted through observation, position monitoring, interviews, and data review. Operational positions were monitored for twelve hours; and four interviews, one internal and three external, were conducted. A total of 104 items were assessed during the evaluation with two deficient items identified that were unrelated to the later accident. Midwest corrected the two items by November 1999.

Smith also opined that the FAA/Midwest contract required the FAA to conduct in-flight evaluations. The in-flight evaluations were to be conducted by certain FAA personnel. The FAA did not conduct any in-flight evaluations of the WRA Tower prior to the accident. Smith opined that if

Fowler had been "evaluated by a full-facility evaluation or something like that, then . . . something would have been learned." Smith opined in his report that had an in-flight audit been conducted, "any deficiency in the proper sequencing of inbound aircraft" would have been detected.

*The Installation of TARDIS*

There are two types of terminal radar displays: certified and uncertified. Certified means that the equipment has gone through diagnostic testing to determine whether or not the equipment meets the specifications for that piece of equipment. Certified radar displays may be used for the separation of aircraft. Uncertified radar displays have not gone through the diagnostic testing and may not be used for the separation of aircraft. Pursuant to FAA Order 7110.65, uncertified radar displays cannot be used to provide radar services and traffic advisories. Uncertified radar displays can be used as an aid to assist air-traffic controllers in visually locating aircraft or in determining the aircraft's spacial relationship to known geographical points.

TARDIS (the radar display observed by the Court during the control tower site visit) was developed in 1992-1994 by Michael Risely, an engineer employed in the FAA's operation center. Risely developed TARDIS because of a perceived need for radar in small towers. TARDIS is a visual tool that can be a highly valuable asset to air traffic controllers. TARDIS was a "remoted radar display" in the national airspace system used to provide assistance to controllers in visually locating aircraft or in determining their spacial relationship to known geographic points (such as Lake Michigan), which can be permanently depicted on the display. TARDIS acts like electronic binoculars or an extra set of eyes, allowing air-traffic controllers to see the actual position of aircraft on a radar screen, rather than relying solely on their own visual or mental picture of the traffic pattern based upon pilot-position oral reports by radio. TARDIS assists an air-traffic controller to orient

20

exactly where airplanes are located when a pilot reports his position. TARDIS enhances safety and saves lives at smaller air-traffic control towers, where conventional radar is too expensive, and is constructed from essentially off-the-shelf equipment at a cost of less than $40,000 per unit. The FAA intended TARDIS to provide radar capability at non-radar air-traffic control towers to afford the air-traffic controllers many of the same radar capabilities that are available at larger airports. In March 1999, the FAA issued a memorandum, which indicated that the FAA considered TARDIS an accepted system. By at least that time, the FAA was aware of all of these significant advantages TARDIS provided to further insure the safe movement of aircraft during take-offs and landings and considered TARDIS a tested and proven system that enhances the safe, orderly, and expeditious flow of air traffic.

The FAA's criteria for determining whether a VFR tower was a "candidate" for a "remoted radar display" (which included TARDIS) is contained in FAA Order 7031.2C, which requires: (1) at least 30,000 annual itinerant recorded operations (operations that originate at a different airport or that occur outside the local traffic pattern of the airport) and (2) operationally adequate low altitude coverage at the satellite airport.[6]  However, a facility meeting the requirements does not constitute a commitment by the FAA to provide such facilities or services. Following "the establishment of an operational requirement [which would include TARDIS], air-traffic demand determines nearly all requirements for air navigational facilities and air-traffic control services. However, since the agency must operate, maintain, and improve air navigation systems within defined budgetary limitations, it is impossible, and it is not economically feasible to satisfy all operational requirements. The facilities

---

[6]Radar coverage for the traffic pattern altitude from a nearby radar site, in the case of WRA, O'Hare International Airport.

and services must be allocated to locations where the greatest benefit will be derived from their cost. Therefore, a second consideration must necessarily be economics." FAA Order 7031.2C further provides that other factors the FAA considers in making decisions about the installation of equipment include: economics, cost/benefit ratios, the number of users at an airport, the best way to accomplish an orderly distribution of equipment, the operational requirements of an airport, general terrain features, and climatological phenomena that may affect aircraft operations and safety.

Douglas Powers, a retired FAA employee, was responsible, in part, for necessary equipment at air control towers of the Great Lakes Region. Powers testified that his office would become aware that a facility wanted or needed a piece of equipment through: (1) a request during the facility and equipment budget process, (2) the receipt of a request or statement of need for a certain piece of equipment for the facility, (3) by learning of the need during a field visit, or (4) through a request from a major facility that a piece of equipment at another facility was needed because it impacted the major facility. After learning of a request, Powers' group would determine if there was a "requirement" for the requested piece of equipment. Factors included in determining whether a piece of equipment was required included whether the problem could be fixed by regulation and/or training and education or whether the problem could be fixed with the equipment. The Government failed to produce any evidence that any of these factors were ever taken into consideration in determining whether or not to install a TARDIS at any VFR airport, including WRA, as discussed below.

Prior to the collision on February 8, 2000, WRA was not identified by the FAA as an airport that qualified for a remoted radar display, such as TARDIS, even though it met both criteria set out above since 1990.

22

In April 1997, Bill Ellis, a Manager of FAA Operations Resources Division, ATO-300, requested a revalidation of an attached list of facilities of VFR towers that were eligible to receive a remoted radar display. The memorandum also requested the inclusion of any additional facilities that qualified for a remoted radar display. WRA was erroneously omitted from the list. In 1999, John Timmerman directed each region to identify control towers that qualified for remoted radar displays. Although WRA met the qualifications to receive a remoted radar display in both 1997 and 1999, it was not identified as a facility that qualified for a remoted radar display. Only after the midair collision in February 2000, was WRA placed on the list of VFR towers that met the qualifications for remoted radar display. A review to determine which towers met the qualifications for a remoted radar display should have taken place on a yearly basis.

Prior to February 8, 2000, a TARDIS had been installed at several locations, including: Traverse City, Michigan; Meigs Field, Chicago, Illinois; Paine Field, Seattle, Washington; Forbes Field, Topeka, Kansas; Johnson County Airport, Olathe, Kansas (test site); Salina Airport, Salina, Kansas (test site); McKinney, Texas; and Laredo, Texas. Up to the time of trial, a TARDIS had been installed and in use in at least twelve VFR traffic control towers. Two of the twelve installations were test sites, which occurred prior to the other ten installations. No data from these test sites were shown to have been compiled and used to determine which, or in what order, VFR towers that meet FAA Order 7031.2C criteria would receive a TARDIS.

Contrary to FAA-stated criteria in FAA Order 7031.2C, the decision on whether or not to install a TARDIS at a particular location was primarily due to "Congressional interest" from local politicians who wanted a TARDIS installed in their district/state or after an accident at a facility. Many times certain congressmen, congresswomen, and/or senators (not every congressional request

23

was honored) would request that a TARDIS be installed after an accident occurred at an airport in their district/state. Congressional pressure was the most important factor in determining which airports would receive a TARDIS. In July 1997, a midair crash that killed seven people occurred at Meigs Field, a few miles South of WRA and also on the West shoreline of Lake Michigan. At that time, Meigs did not have a TARDIS. In January 1998, a TARDIS was installed at Meigs Field in reaction to the fatal midair collision and political pressure for installation. At that time, Meigs had fewer itinerant operations and fewer total operations than WRA.

In July 1999, Traverse City's airport received a TARDIS, following a request from Senator Carl Levin. In December 1999, the airport in McKinney, Texas, received a TARDIS following a request by the City of McKinney and Senator Phil Gramm. The City of McKinney sought the radar to earn revenue by enabling corporate jets used by Texas Instruments to land at the nearby regional airport instead of the airport at Dallas/Fort Worth. In March 2000, Stewart International Airport, in Newburgh, New York, received a TARDIS after a request from Senator Charles Schumer and Congresswoman Sue Kelly. In May 2001, the airport in Gainesville, Florida, received a TARDIS after a request from Congresswoman Karen Thurman. In February 2002, the airport in Tupelo, Mississippi, received a TARDIS after congressional interest.

Following the February 8, 2000 accident, Dan Bitten requested a TARDIS be installed at WRA. The FAA denied that request. Later, Michael Jordan, the former professional basketball player who used WRA, and several other politicians endorsed WRA's receiving a TARDIS; and the FAA approved WRA to receive a TARDIS. A contributing factor in the decision to install a TARDIS at WRA was that the February 8, 2000 midair collision was a major news event.

Prior to February 8, 2000, the FAA did not follow FAA Order 7031.2C in determining

24

whether to install a TARDIS at WRA. Instead, as set out more specifically above, the FAA's decision to install a TARDIS was based on the request of certain members of Congress, other influential people, and, on at least two occasions, after fatal midair collisions had occurred. The requests for a TARDIS by other politicians or members of the general public and/or non-influential persons were ignored.

If a TARDIS had been installed by the FAA and was operational on February 8, 2000, it would have depicted the location of the Hock Cessna and the Collins Zlin airplanes and alerted the controller to their converging collision courses and would have prevented the collision. Also, had a TARDIS been installed prior to the collision, Fowler would have been able to determine the actual positions of Collins and Hock in relation to the Lake Michigan shoreline and their dangerous proximity to each other if they were allowed to proceed along the routes as he directed. Fowler admitted that based upon his experience with a TARDIS, including the one that was installed at WRA subsequent to February 8, 2000, the midair collision would not have occurred if a TARDIS had been available. Had a TARDIS been installed by the FAA prior to February 8, 2000, the midair collision that killed Collins, Hock, and Luscher would not have occurred. The FAA's failure to install a TARDIS at WRA before February 8, 2000, caused or contributed to the midair collision on that date.

<h2 style="text-align:center">CONCLUSIONS OF LAW</h2>

The Government is generally immune from suits for money damages under the principle of sovereign immunity. The Government, though, has enacted a broad waiver of that immunity through the FTCA, which authorizes suits against the Government for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under

circumstances where the United States, if a private person, would be liable . . . ." 28 U.S.C.

§ 1346(b); *Calderon v. United States*, 123 F.3d 947, 948 (7th Cir. 1997) (*Calderon*). This "waiver

of immunity is far from absolute; many important classes of tort claims are excepted from the

[FTCA's] coverage." *Calderon*, 123 F.3d at 948. However, there is no waiver of sovereign immunity

for tort actions brought against an independent contractor, as the Government is only liable for torts

"caused by the negligent or wrongful act or omission of any employee of the Government while acting

within the scope of his office or employment." 28 U.S.C. § 1346(b).

　　As used in § 1346(b), an employee of the Government includes "employees of any federal

agency" but excludes "any contractor with the United States." 28 U.S.C. § 2671; *Alinsky v.

United States*, 415 F.3d 639,644 (7th Cir. 2005) (*Alinsky II*); *Quilco v. Kaplan*, 749 F.2d 480, 482-83

(7th Cir. 1984) (*Quilco*).

　　"[W]hen the relationship between the [G]overnment and a person is fixed by contract, the

distinction between an employee and independent contractor turns 'on the absence of authority in the

principal to control the physical conduct of the alleged employee in the performance of the contract.'"

*Quilco*, 749 F.2d at 483 (alterations omitted), *quoting Logue v. United States*, 412 U.S. 521, 527

(1973) (*Logue*). "A critical factor in distinguishing an [employee] from a contractor is the power of

the Federal Government 'to control the detailed physical performance of the contractor.'"

*United States v. Orleans*, 425 U.S. 807, 814 (1976) (*Orleans*), *quoting Logue*, 412 U.S. at 528. Thus,

the key question "is not whether the [contractor] receives federal money and must comply with

federal standards and regulations, but whether its day-to-day operations are supervised by the Federal

Government." *Orleans*, 425 U.S. at 815. Other relevant considerations include whether the

Government has authority to make personnel decisions and whether the contractor's finances are

26

controlled by the Government. *Alinsky v. United States*, 156 F. Supp. 2d 908, 912 (N.D. Ill. 2001)

*(Alinsky I)*, *citing Peoples Gas Light & Coke Co. v. United States*, 1990 WL 129359, at *4 (N.D. Ill.

1990).

Another exception to the waiver of sovereign immunity for tort actions is the discretionary

function exception.

> The discretionary function exception provides that the FTCA does not apply to:
> [a]ny claim based upon an act or omission of an employee of the Government,
> exercising due care, in the execution of a statute or regulation, whether or not such
> statute or regulation be valid, or based upon the exercise or performance or the
> failure to exercise or perform a discretionary function or duty on the part of a
> federal agency or an employee of the Government, whether or not the discretion be
> abused.

28 U.S.C. § 2680(a). A two-prong test has been promulgated for determining whether this exception

bars a suit against the United States: (1) whether the conduct involves an element of judgment or

choice by the Government entity and (2) whether the action or decision is based on public policy

considerations. *See United States v. Gaubert*, 499 U.S. 315, 323 (1991) *(Gaubert)*; *Berkovitz v.*

*United States*, 486 U.S. 531, 537 (1988) *(Berkovitz)*.

The first prong focuses on whether a federal statute, regulation or policy specifically

prescribes the course of conduct for the Government entity to follow. *See Gaubert*, 499 U.S. at 322;

*Berkovitz*, 486 U.S. at 536. The second prong entails the "basic inquiry" of whether the challenged

discretionary acts of the Government entity "are of the nature and quality that Congress intended to

shield from tort liability." *United States v. Varig Airlines*, 467 U.S. 797, 813 (1984) *(Varig)*.

The FTCA does not provide remedies premised upon a theory of strict liability. *See Smith v. Pena*, 621 F.2d 873, 877-78 (7th Cir. 1980); *Russell v. United States*, 626 F. Supp. 1217, 1221 (S.D. Ind. 1986).

Suits brought under the FTCA are governed by the law of the state in which the negligent act or omission allegedly occurred. 28 U.S.C. § 1346(b); *Midwest Knitting Mills v. United States*, 950 F.2d 1295, 1297 (7th Cir. 1991). Accordingly, Illinois law is applied to the present case. To prove a claim of negligence under Illinois law, a plaintiff must prove that: (1) the defendant owed a duty to the plaintiff; (2) a breach of that duty; (3) the breach was the proximate cause of the plaintiff's injuries; and (4) the plaintiff did, in fact, suffer damages. *Adams v. Northern Illinois Gas Company*, 211 Ill.2d 32, 43 (2004).

Whether a duty exists is based on four factors: the foreseeability that the conduct will result in injury to another, (2) the likelihood of injury, (3) the magnitude of guarding against the likelihood of injury, and (4) the consequences of placing that burden on the defendant. *See Sandoval v. City of Chicago*, 357 Ill. App. 3d 1023, 1027 (2005).

Proximate cause includes two distinct requirements: cause in fact and legal cause. *See Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455 (1992) (*Lee*). Cause in fact is found "when there is a reasonable certainty that a defendant's acts caused the injury or damage." *Lee*, 152 Ill. 2d at 455. If multiple factors may have combined to cause the injury, the defendant's conduct must be a material element and a substantial factor in bringing about the injury. *Lee*, 152 Ill. 2d at 455.

Legal cause is established if the plaintiff shows that the defendant's conduct was so closely tied to the plaintiff's injury that the defendant should be held responsible for the injury. *See*

*Young v. Bryco Arms*, 213 Ill. 2d 433, 446 (2004). Legal cause involves an assessment of foreseeability of whether the injury is the type that a reasonable person would see as a likely result of his conduct. *See Lee*, 152 Ill. 2d at 456.

Under the Illinois comparative negligence doctrine, a plaintiff is barred from recovering damages if the plaintiff is more than fifty percent at fault. If the plaintiff's percentage of fault is fifty percent or less, the plaintiff's recovery is diminished in proportion to his or her percentage of fault. *See* 735 ILCS 5/2-11©); *Karas v. Strevell*, 369 Ill. App. 3d 884, 907-08 (2006).

## DECISION

### *Fowler's Negligence*

Fowler owed a duty of reasonable care to Collins, Luscher, and Hock while acting as the air-traffic controller at WRA on February 8, 2000. Fowler, based on the preceding findings, breached the duty of reasonable care in one or more of the following: by failing to determine that radio transmissions he was receiving from Collins and Hock did not support Fowler's understanding of the location of the aircraft in relation to each other and the airport; by failing to determine that Collins' and Hock's aircraft were operating in an unsafe proximity to each other and by his directions to Collins and Hock, which created this dangerous condition; by failing to visually confirm the flight patterns of the approaching airplanes; and by failing to issue a safety alert to both pilots to avoid the midair collision when he reasonably should have done so. Fowler's breach of his duty was a proximate cause of Plaintiffs' injuries, and Plaintiffs suffered substantial damages.

29

*FAA Liability Based on Fowler's Negligence*

Plaintiffs claim that the FAA is responsible for the negligence of Midwest's employee, Fowler. The United States argues that the Court lacks subject-matter jurisdiction under the independent-contractor exclusion of the FTCA. Plaintiffs counter that Midwest was not an independent contractor and that Midwest and Fowler are employees of the FAA.

In support of their argument, Plaintiffs cite the "pervasive control" the FAA exerts over the day-to-day operations of Midwest under the contract between Midwest and the FAA. Examples of the day-to-day control cited by the Plaintiffs, as more fully found above, include: (1) the requirement that Midwest comply with FAA regulations and FAA Orders; (2) the requirement that Midwest adopt SOP and that those SOP comply with FAA regulations and FAA Orders; (3) the requirement that Midwest staff the tower per the Staffing Plan submitted by Midwest to the FAA in the bidding process, that the FAA must be advised of staffing modifications, and that the FAA can supplement the staff for special events; (4) the FAA controls the hours of operations; (5) the requirement that air-traffic controllers meet specific FAA regulations; (6) the daily reporting requirements for the FAA; (7) the requirement that Midwest have approved quality assurance and drug testing programs; (8) the requirement that the wages and benefits comply with the Service Contract Act of 1965; (9) the requirement that Midwest terminate an employee if the FAA finds the employee unacceptable; (10) the requirement that Midwest add the Government as an additional named insured under Midwest's liability policy; and (11) the FAA provides the equipment and the maintenance on the equipment used in the tower.

The contractual obligations imposed on Midwest demonstrate that the operation of an air-traffic control tower is heavily regulated and controlled by the United States through the FAA. The

contractual obligations directly affect the day-to-day operations of Midwest and insure strict compliance with the FAA regulations and FAA Orders, including FAA control over personnel decisions and finances. Based solely upon the extensive evidence presented at trial, it would appear that the contract here established the authority of the FAA to control the physical conduct of Midwest in the operation of the WRA Tower at the time of the midair collision.

However, the same contract between the FAA and Midwest in the present case was at issue in *Alinsky*. The *Alinsky* court held that Midwest was an independent contractor after finding that the oversight the FAA had over Midwest did not "dispute the Government's assertion that day-to-day management . . . rested entirely with Midwest." *Alinsky I*, 156 F. Supp. 2d at 912. The court's holding that Midwest was an independent contractor was affirmed by the Seventh Circuit. *See Alinsky II*, 415 F.3d at 644. Plaintiffs attempt to distinguish *Alinsky*, arguing that *Alinsky* dealt with facts and theories that are not present here. However, it is uncontroverted that the same contract provisions that Plaintiffs rely upon to demonstrate the day-to-day control necessary to make Midwest a Government employee were present in the contract before the *Alinsky* court, which determined Midwest was an independent contractor pursuant to that agreement.

Plaintiffs cite *State of Maryland v. Manor Real Estate & Trust Co.*, 176 F.2d 414, 419 (4th Cir. 1949) (*Manor Real Estate*), where the court found that a contractor was a Government employee because the contractor was subject to the detailed supervision of the Government and because the contract provided that the contractor would be bound by Government regulations. Plaintiffs also cite *Kolovitz v. United States*, 1995 WL 32612 (N.D. Ill. Jan. 26, 1995) (*Kolovitz*), in which the district court denied the United States' motion to dismiss as to a contractor, finding that there was a disputed fact question whether the Government supervised and controlled the contractor's day-to-day

31

performance. There, the contract provided that the Government inspect the contractor's work on a daily basis prior to the contractor's arriving at work; and if problems were identified, the Government would sometimes stay with the contractor until the repair work was completed and then inspect the repairs. *See Kolovitz*, 1995 WL 32612 at * 3-4. In further support of their argument, Plaintiffs identify the FAA Order language and testimony that the FAA towers and the contract towers are run essentially in the same manner, with the same oversight, support and guidance to all towers. However, as discussed above, the claim that the contract here at issue demonstrated day-to-day control by the FAA and rendered Midwest a Government employee has been rejected by the Seventh Circuit in *Alinsky*.

Based on the above, Midwest is a contractor within the meaning of 28 U.S.C. § 2671. Therefore, any negligence of Midwest through its employees cannot be the basis upon which to hold the United States vicariously liable.

*Failure of the FAA to Install TARDIS*

Based on the preceding findings, the FAA was negligent in failing to install a TARDIS at WRA before February 8, 2000. The FAA has a duty to ensure the safety of flight, including the efficient utilization of navigable airspace and the separation and prevention of collisions between aircraft. The FAA breached its duty by failing to install a TARDIS prior to February 8, 2000, and/or by failing to apply its stated criteria to determine which, and in what order, VFR airports (including WRA) should have received a TARDIS. If a TARDIS had been installed and operating on February 8, 2000, the TARDIS would have depicted the location of the Hock Cessna and the Collins

32

Zlin airplanes and alerted Fowler of the converging collision courses, allowing the collision to be prevented. The FAA's failure to install a TARDIS at WRA before February 8, 2000, directly and proximately contributed to the midair collision on February 8, 2000.

The United States argues that the Court lacks subject-matter jurisdiction over Plaintiffs' claim based on this negligence because the decision not to install the TARDIS devise falls within the discretionary function exception of the FTCA.[7]

Specifically, that part of the discretionary function exception provides that: "FTCA does not apply to any claim . . . **based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency . . . whether or not the discretion be abused.**" 28 U.S.C. § 2680(a) (Emphasis added).

As previously stated, the applicable test in determining whether this exception bars suit against the FAA in the instant case requires : (1) a determination whether the conduct involves an element of judgment or choice by the Government entity and (2) a determination whether the action or decision is based on public policy considerations. *See Gaubert*, 499 U.S. at 323; *Berkovitz*, 486 U.S. at 537. The first prong focuses on whether a federal statute, regulation or policy specifically prescribes the course of conduct for the Government entity to follow. *See Gaubert*, 499 U.S. at 322; *Berkovitz*, 486 U.S. at 536. If the action taken was mandatory, then the exception does not apply. *See Gaubert*, 499 U.S. at 322. Here, no federal statute, regulation or policy mandates that the FAA

---

[7]The independent-contractor exception does not apply to bar the Plaintiffs' claim that the FAA was negligent in not installing a TARDIS before February 8, 2000, because the FAA solely controlled which airports would receive a radar, including a TARDIS. *See Alinsky I*, 156 F. Supp. 2d at 914-16 (independent-contractor exception does not apply to act or conduct that is solely controlled by the FAA because the independent contractor lacks any authority as to that act or conduct).

install a TARDIS at VFR control towers, such as WRA. Accordingly, the second prong of the test must be considered.

A discretionary decision is only shielded from FTCA liability if it is susceptible to policy judgments that involve the exercise of "social, economic, or political" judgments. *See Gaubert*, 499 U.S. at 323. A discretionary decision that does not involve policy considerations is not shielded from liability; instead, the act must "be based on the purposes that the regulatory scheme seeks to accomplish." *Gaubert*, 499 U.S. at 325 n. 7. Once a discretionary function has been established, the Government cannot be held liable even for its negligent acts in implementing the discretionary function. *See Grammatico v. United States*, 109 F.3d 1198, 1203 (7th Cir. 1997) (*Grammatico*); *Cassens v. St. Louis River Cruise Lines, Inc.*, 44 F.3d 508, 515 (7th Cir. 1995) (*Cassens*); *Routh v. United States*, 941 F.2d 853, 855 (9th Cir. 1991) ("Negligence is irrelevant to the discretionary function inquiry.").

The Plaintiffs contend the Court should consider the specific bases of the FAA's decisions to install or not to install a TARDIS at VFR airports prior to February 8, 2000, *i.e*, the requests from certain congressmen and other prominent persons or a previous fatal injury at a VFR airport. Plaintiffs then argue that the decision by the FAA not to install a TARDIS at WRA before February 8, 2000, on this basis, is not the kind of FAA conduct involving policy considerations Congress intended to shield from tort liability nor is it based on purposes in furtherance of the FAA regulatory scheme. If the exception is to be applied with the narrow focus of an examination of the

34

specific decision and the reasons therefore, as Plaintiffs assert, the FAA would not be immune from liability for its conduct in failing to install a TARDIS at WRA before February 8, 2000.[8]

The FAA argues to the contrary that the decision regarding the installation of equipment, including TARDIS, was controlled by FAA Order 7301.2C, which is based on public policy considerations and discretionary acts of the nature Congress intended to shield from tort liability, as claimed here.

As demonstrated by these conflicting arguments, the second prong could be construed both "narrowly" and "broadly," i.e., requiring a inquiry into the basis of a specific decision or focusing on the *nature* of the decision generally and whether it was framed by public policy considerations.

The *Gaubert* Court addressed this issue:

> "When established Governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion . . . . the challenged actions [must be] the kind of conduct that can be said to be grounded in the policy of the regulatory scheme. The focus on the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.

*Gaubert*, 499 U.S. at 324-25 (internal quotations and citations omitted). The *Gaubert* Court refers to the "challenged actions," which can be read to imply a narrow examination of the specific acts of the decision maker as whether they are grounded in the public policy of the regulatory scheme, (here, the actual reasons for installing TARDIS). However, the Court then directs "the focus on the inquiry"

---

[8]The FAA argues that requests from certain Congressmen and/or other prominent persons and after-the-fact responses to fatal midair collisions are the kind of public policy considerations that form the basis for agency decisions Congress intended to protect as an exercise of the discretionary function. However, the FAA has failed to provide any authority or other support for this interpretation of the statute.

toward a broader application of the exception, which requires a consideration of the "nature of the action" by the FAA (as opposed to the actual act or conduct) and whether the *nature* of the action is "susceptible" to policy analysis.

If the second prong of the test is construed narrowly, as Plaintiffs urge, the challenged discretionary act in the present case would be the decision regarding the installation of a TARDIS unit. The decision to install a radar based only on the request of a congressperson or other influential person or *after* a midair collision cannot be said to be susceptible to policy analysis. Thus, the exception would not apply.

The FAA argues that FAA Policy 7031.2C demonstrates that the decision of whether a radar should be installed at an air-traffic control tower involves an element of choice by the FAA. This policy statement sets out certain factors, including economic, cost benefit ratio, and other related factors that are to be considered in installing a radar at an airport. The nature of these actions to be considered regarding equipment installation are "susceptible to policy analysis." If the second prong of the test is, thus, construed broadly, the protection of the discretionary function would apply.

Plaintiffs contend that even under this broader interpretation, here, the FAA completely disregarded FAA Policy 7031.2C and, instead, actually decided to install a TARDIS for reasons that were not based on public policy considerations nor on the purposes the FAA regulatory scheme seeks to accomplish. However, the FAA's conduct would then constitute a failure to exercise or perform a discretionary function or an abuse discretion; and it specifically exempt. See 28 U.S.C. § 2680(a) ("FTCA does not apply to any claim . . . **based upon the . . . failure to exercise or perform a discretionary function or duty on the part of a federal agency . . . whether or not the discretion be abused.**"). (Emphasis added.)

36

In construing the discretionary function exception provision, words or phrases of the statute cannot be rendered meaningless, redundant, or superfluous. *See United States v. Miscellaneous Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004). Therefore, Plaintiffs' argument that the FAA did not follow its own directive, when considering the language of the discretionary function exception in its entirety, must be rejected.

A review of Seventh Circuit case law supports a "broad" construction of the discretionary function exception and a focus on the nature of the decision in question.

In *Rothrock v. United States*, 62 F.3d 196 (7th Cir. 1995) (*Rothrock*), Rothrock was injured after his car slid down an embankment adjacent to a bridge. Rothrock sued the United States under the FTCA, contending that the United States was liable for failing to ensure, as a condition of its funding decision, that the bridge was constructed in accordance with the applicable safety standards. The district court dismissed Rothrock's complaint based on the discretionary function exception and denied an extension of time for additional discovery. The Seventh Circuit affirmed, holding that the statutes and regulations involved in deciding whether to apply the Government's safety standards in funding the bridge construction demonstrated that the decision was discretionary and that the discretionary judgment involved the balancing of policy factors. The court held that the "decision is explicitly subject to policy analysis under the statute and the regulations, which list several considerations to take into account during such an analysis." *Rothrock*, 62 F.3d at 200. The court did not consider whether the decision regarding the bridge construction *was actually made based on the applicable statutes and regulations.* Significantly, the court upheld the decision denying the plaintiff additional discovery regarding the effect, if any, the controlling standards had on the Government's actual decision. Rather, the court held the plaintiff's argument for discovery on this issue "ignores the

37

operation of the [discretionary function] exception. Our concern is whether the statute or regulations grant the [United States] discretion to act on this issue and whether that decision was susceptible to policy analysis. *Whether or not the employees responsible for making this decision actually took these factors into account is not the issue. See Gaubert*, 499 U.S. at 324-25." (Emphasis added). Instead, the lack of jurisdiction based on the discretionary function exception was "grounded" in the statutes and regulations. *Rothrock*, 62 F.3d at 200. In other words, the "reason why"the actual decision was made was not relevant.

When this rationale is applied to the instant case, FAA Policy 7021.C2 explicitly states that the analysis is based on policy considerations and demonstrates that the decision to install a radar was discretionary. Moreover, to apply the discretionary exception based on whether or not the policy was followed (was the discretionary function performed or abused) in the specific decision exercising the discretion conferred by statute or regulation would, as discussed above, render meaningless the language of the FTCA, set out above, exempting from liability the failure to exercise, or the abuse of, discretion. *See Rothrock*, 62 F.3d at 200.

In the Seventh Circuit opinion in *Cassens*, 44 F.3d at 510, the plaintiff fell on a stairway on a cruise ship that had no handrails. The cruise ship owner filed a third-party suit against the Coast Guard based on the Coast Guard's certification that the ship was fit to sail and in compliance with applicable regulations despite the absence of the handrails. The suit was dismissed based on the discretionary function exception. *Cassens*, 44 F.3d at 510. The court noted that "the appropriate object of inquiry is the *nature* of the Coast Guard inspection procedure. The existence of regulatory requirements, however detailed, is of no import if the means of determining compliance, i.e., the inspection procedure itself – involves the **type of judgment** protected by the discretionary function." (Emphasis

added). The court rejected the plaintiff's argument that the discretionary function exception did not apply because the failure to perceive the absence of handrails does not involve the exercise of discretion, holding: "the protected discretion at issue is the discretion to formulate and conduct a specific inspection *procedure* for a particular ship. The discretionary function exception shields the entire inspection process including alleged negligent omissions. If the discretionary function exception could be pierced by showing negligent acts in implementing the discretionary function, the exception would be no shield at all."

In *Grammatico*, 109 F.3d at 1200, the plaintiff filed suit against the United States after he was injured by a milling machine that had been purchased at a public auction conducted by a division of the Department of Defense. Grammatico alleged the Government was liable in strict liability, negligent in selling the machine with defects and lack of certain safety equipment, and negligent for failing to inspect the machine to make sure it was safe. The strict liability claim was dismissed because the FTCA does not permit such claims. The negligence claims were dismissed based on the discretionary function exception. *Grammatico*, 109 F.3d at 1200.

The Seventh Circuit noted: "In order to determine whether the sale of the milling machine by [the Government] involved an exercise of judgment of the kind that the discretionary function exception was designed to shield, we examine the statutes and regulations which authorized the sale." The inquiry by the Seventh Circuit was broad – the sale of milling machines (in general) – not the sale of the milling machine as sold or as how the sale was conducted in this particular case. *Grammatico*, 109 F.3d at 1201. Based on the applicable regulations, the court found that the manner in which the Government sold its property was a discretionary function. *Grammatico*, 109 F.3d at 1202. Looking at the regulation that provided "Congress' intent 'in enacting this legislation to provide for the

Government an economical and efficient system for . . . the disposal of surplus property," the court held that decisions concerning selling of surplus property required the balancing of safety and economics which "clearly fell within the discretionary function exception." *Grammatico*, 109 F.3d at 1202. Further, the Government was not subject to suit for damages stemming from the Government's failure to require pre-sale inspections and issue warnings. The court noted that the failure of the Government to require these safeguards may be an abuse of discretion; "however, when Congress has delegated both a task to an agency and the discretionary authority to make the policy-based judgments necessary to effectuate that task, an abuse of the discretion cannot form the basis for Governmental liability." *Grammatico*, 109 F.3d at 1202. The court further addressed the plaintiff's argument that the discretionary function exception did not apply because there was no evidence that the Government made a decision to disclaim liability for negligence – in other words, no discretion had been exercised. The court held that the plaintiff "misapprehends the nature of the discretionary function exception. Once a discretionary function has been *identified* – in this case, the sale of surplus property – the Government may not be liable for its negligence in carrying out the discretionary act." *Grammatico*, 109 F.3d at 1202 (emphasis added).

In *Doolin v. United States*, 1994 WL 233829 (N.D. Ill. May 23, 1994), the plaintiff alleged the Government (HUD) was negligent in failing to more closely supervise or monitor the independent agent who was managing the HUD property where the plaintiff was injured. The agent failed to visit any of the properties based on his belief that a travel freeze was in place and because of the demands of his workload. Looking to a statute relevant to the management of HUD property, the court found that the degree to which HUD supervises properties and its agent's performance in that regard were discretionary. Furthermore, the discretion was grounded in public policy in light of the limited

resources and the existing workload. *Doolin*, 1994 WL 233829 at * 2. Similarly, which properties an agent visited was discretionary. The court rejected the argument that the agent's failure to visit any property removed this case from the discretionary function exception because: "Where determinations as to which properties to visit and how closely to monitor an AMB are left to a realty specialist's discretion, any determination as to what properties to visit is a discretionary function. The failure to visit a particular property in order to monitor an AMB cannot be the basis of FTCA liability." *Doolin*, 1994 WL 233829 at * 3.

Courts of other circuits have also interpreted the exception "broadly" in this regard. In *LaBrecque v. L3 Comm. Titan*, 2007 WL 1455850 (D. Colo. May 16, 2007) (*LaBrecque*), the plaintiff alleged that she was fired from her Government job based solely on retaliation. The court found that employment and termination decisions were discretionary and that such decisions typically involve the weighing of social, economic, and/or political policy. Even accepting plaintiff's allegation that she was fired solely out of retaliation, the discretionary function exception prohibited suit because the "'focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis.' [quoting *Gaubert*]. The exception applies 'whether or not the discretion involved be abused.'" [quoting 28 U.S.C. § 2680(a)]. *LaBrecque*, 2007 WL 1455850 at * 4. Clearly, this court applied the statute broadly. *See also, Miller v. United States*, 163 F.3d 591, 593 (9th Cir. 1998) ("The decision need not be actually grounded in policy considerations, but must be, by its nature, susceptible to policy analysis." [citing *Gaubert*]; *Childers v. United States*, 40 F.3d 973, 974 n.4 (9th Cir. 1995) ("The application of the exception does not depend, however, on whether the federal officials actually took public policy considerations into account. All that is required is that the applicable statute or

regulation gave the Government agent discretion to take policy goals into account." [citing *Gaubert*]; *Domingues v. United States*, 2007 WL 1500832 (N.D. Cal. May 21, 2007) ("Under the second prong, the Government need not show that the decision maker actually considered any particular policy, it merely must show that the decision is susceptible to a policy analysis."); *Sauders v. South Carolina Public Serv. Auth.*, 856 F. Supp. 1066, 1073 (D.S.C. 1994) ("Because the inquiry concerns the nature of the conduct and not an investigation into the subjective decision-making process, the discretionary function exception applies even in the absence of a conscious policy decision, provided the decisional area is one susceptible to policy analysis.").

Plaintiffs in the present case rely heavily on *Cope v. Scott*, 45 F.3d 445 (D.C. 1995) (*Cope*), in support of their argument that the discretionary function exception does not apply. In *Cope*, the plaintiff filed suit against the National Park Service after he was injured on a road within a park. Plaintiff alleged that the Park Service was negligent in maintaining the road itself (such paving materials used and not including grooves in the curved road) and negligent by failing to place and maintain appropriate and adequate warning signs along the road (the road had a history of accidents due to poor road surface). The *Cope* court found that the plaintiff's claim as to negligent maintenance of the road itself was barred by the discretionary function exception, but his claim for negligence in failing to maintain and place warning signs was not barred by the exception. *See Cope*, 45 F.3d at 446, 452.

As to the plaintiff's first claim, the *Cope* court found that failure to adequately maintain the road claim was exempt because the decisions required in maintaining the road were discretionary and would require the balancing of many factors, such as the road's overall purpose, the allocation of funds, and the safety of park visitors and drivers.

As to the second claim, the court found that the posting of signs in the park involved the exercise of discretion, but it was not the type of discretion exempted by the FTCA. The Government placed traffic control signs throughout the parkway but failed to place a "slippery when wet" warning sign at one particularly hazardous portion. The Government contended that the placement of warning signs implicated public policy concerns regarding aesthetics of the parkway. *Cope*, 45 F.3d at 452. The Government policy on the issue provided that warning signs should be posted only "when it is deemed necessary." *Cope*, 45 F.3d at 451. The court disagreed, rejecting the Government's argument of aesthetic considerations because the parkway was managed as a commuting road, not as a road for nature preservation. The *Cope* court found that once the Government "had taken steps to warn users of the dangers inherent in that use "by placing warning signs at certain locations on the roadway, it cannot argue that "its failure to ensure that those steps are effective involves protected 'discretionary' decisions." Therefore, the failure to post adequate warning signs did not implicate social, economic, or political judgments to be protected from suit. *Cope*, 45 F.3d at 452. However, the *Cope* court rejected plaintiff's argument that the Park Service could not claim the exception unless the Government demonstrated that there was an actual, specific decision involving the balancing of competing policy considerations. Citing *Gaubert*, the court found that: "The Supreme Court has emphasized, however, that the issue *is not the decision* as such, but whether the 'nature' of the decision implicates policy analysis. What matters is not what the decisionmaker was thinking, but whether *the type of decision being challenged is grounded in social, economic, or political policy.* Evidence of the actual decision may be helpful in understanding whether the 'nature' of the decision implicated policy judgments, but the applicability of the exemption does not turn on whether the challenged

43

decision involved such judgments." *Cope*, 45 F.3d at 449 (emphasis added). Therefore, *Cope* is read to reject a narrow interpretation of the discretionary function exception from suit.

Plaintiffs also rely on *Cestonaro v. United States*, 211 F.3d 749 (3rd Cir. 2000) (*Cestonaro*). The *Cestonaro* court found that the National Park Service was amenable to a wrongful death suit stemming from a murder in an unofficial parking lot within the boundaries of a national historic site managed by the National Park Service. The *Cestonaro* court rejected the Government's policy argument that its decisions not to add additional lighting nor post warning signs were grounded in the Government's objective of returning the area to its historic appearance. *Cestonaro*, 211 F.3d at 756-57. The initial decision to maintain the parking lot may have been discretionary, but subsequent decisions concerning the parking lot "were not necessarily protected." *Cestonaro*, 211 F.3d at 756.

To the extent they are not inconsistent with Seventh Circuit law, *Cestonaro* and *Cope* are readily distinguished from the instant case. Contrary to *Cestonaro* and *Cope*, here, the FAA regulations and policy statements specifically provide that the decision to place equipment, such as a radar, at a control tower is an ongoing discretionary act that implicates social, economic, or political judgments. In *Cestonaro* and *Cope*, Government policy or regulation was lacking; and the Government failed to demonstrate that their subsequent decisions were discretionary functions based on social, economic, or political judgments. *See Gaubert*, 499 U.S. at 324; *Varig*, 467 U.S. at 819-20.

Other cases specifically involving the FAA and equipment include: *Colorado Flying Academy, Inc. v. United States*, 724 F.2d 871, 876 (10th Cir. 1984) (design and maintenance of terminal control area surrounding Denver Airport fell within discretionary function exception); *Scruggs v. United States*, 959 F. Supp. 1537, 1548 (S.D. Fla. 1997) ("decisions pertaining to expenditure of funds for

44

radar sites and personnel training clearly involve the balancing of social, economic, and political objectives . . . ." – the court did not look to the actual actions taken by the FAA in relation to the safety issues); *Momen v. United States*, 946 F. Supp. 196, 201-02 (N.D.N.Y. 1996) (furnishing of specific navigational aides by the FAA and FAA approach procedures fell with discretionary function exception – the court did not look to the actual actions taken by the FAA in relation to the issues).

These cases demonstrate that the exception shielding the Government from suit is applied broadly in this circuit (and elsewhere) and must be so applied here. As discussed above, the decision regarding the installation of a radar (TARDIS) is discretionary and subject to policy judgment. *See Varig*, 467 U.S. at 821 ("FAA has a statutory duty to promote safety in air transportation, not to insure it."); *West v. Federal Aviation Admin.*, 830 F.2d 1044, 1047-48 (9th Cir. 1987) (*West*) (determination of safety requirements involves balancing social, economic, and political judgments). Therefore, the conduct of the FAA regarding the installation of TARDIS in the instant case may not be the basis of a claim in tort under the FTCA.

In a related argument, Plaintiffs argue that the discretionary function exception is not applicable because the FAA did not intentionally decide not to install a TARDIS but "missed" it.

Plaintiffs' argument is essentially that the radar was not installed because it was missed – not included on the list of candidates until after the accident. Thus, the FAA failed to perform its discretionary function and/or abused its discretion. However, the exception still applies pursuant to the FTCA and the cases discussed above. *See* 28 U.S.C. § 2680(a) (FTCA does not apply to claim based on the "failure to exercise or perform a discretionary function or duty . . . .").

Plaintiffs also argue that the discretionary function exception does not apply because the FAA violated its contract with Midwest by not installing a radar at WRA even though it qualified for a tower as early as 1990. Plaintiffs do not cite any authority for the proposition that a breach of contract prohibits the application of the discretionary function exception for a tort claim brought under the FTCA. Furthermore, Plaintiffs' primary support for its conclusion that the FAA breached its contract with Midwest is the expert opinion of Richard Burgess, who opined that the contract between the FAA and Midwest required the installation of a radar and that the failure to install the radar was a breach of the contract. Burgess failed to support this legal conclusion, and his testimony in this regard is given no weight.

Based on the above, the discretionary function exception bars Plaintiffs' claim under the FTCA that the FAA was negligent in not installing a TARDIS at WRA.

*Failure to Perform In-Flight Evaluations*

Plaintiffs argue that the FAA failed to conduct mandatory in-flight evaluations at WRA that would have uncovered the negligent air-traffic control methods used by Fowler. Plaintiffs rely on their expert, Smith, in this regard.

As discussed above, Smith opined that the FAA and Midwest contract required that the FAA conduct in-flight evaluations of WRA. The contract requires that the FAA conduct "full-facility, followup, and in-flight/preflight evaluations at FCT locations in accordance with FAA Order 7010.1." FAA Order 7010.1 provides that full facility evaluations are "normally" conducted once every two years. As to in-flight/preflight evaluations, FAA Order 7010.1 requires that two preflight evaluations be conducted annually on each facility service station and automated flight service station. FAA Order 7010.1 does not specify if, or how often, in-flight evaluations (as opposed to preflight evaluations)

46

must be conducted. Accordingly, FAA Order 7010.1 (and, therefore, the FAA and Midwest contract) did not mandate in-flight evaluations.

Furthermore, if FAA Order 7010.1 were deemed mandatory and not subject to the exception, Plaintiffs have failed to prove, by a preponderance of the evidence, that the lack of an in-flight evaluation was the proximate cause of the February 8, 2000 accident. Plaintiffs failed to prove that there is a reasonable certainty that the lack of an in-flight evaluation caused the February 8, 2000 accident or was a material element and a substantial factor in bringing about the accident. Smith opined that had an in-flight audit been conducted; "any deficiency in the proper sequencing of inbound aircraft" would have been detected; thus, implicitly, the collision would have been avoided. However, no factual bases are provided for Smith's conclusions. In addition, Smith's testimony and other evidence at trial undermines his conclusion. At trial, Smith testified that if Fowler had been "evaluated by a full-facility evaluation or something like that, then . . . something would have been learned." However, a full-facility evaluation had been conducted by the FAA in late August 1999; and only two items that were unrelated to the later accident were identified and corrected by November 1999. Nor does Smith identify the "something" that would have been learned or link that "something" to the prevention of the accident. Plaintiffs also failed to demonstrate that it was foreseeable that the February 8, 2000 accident would be a likely result of the failure to conduct an in-flight evaluation.

*Fowler's Lack of a Break on February 8, 2000*

Lastly, the Plaintiffs argue that the FAA negligently permitted Fowler to work without a break as required by FAA Order 7031.2. Again, Fowler was not an FAA employee; and the FAA cannot be held vicariously liable for the negligent acts of Fowler. In addition, "[n]either can the FAA be held responsible for merely failing to monitor Midwest's compliance with safety or staffing needs." *Alinsky*

47

*I*, 156 F. Supp. 2d at 914, *citing Varig*, 467 U.S. 819-21; *Kirchman v. United States*, 8 F.3d 1273, 1276-77 (8th Cir. 1993); *see also Alinsky II*, 415 F.3d at 647 (affirming *Alinsky I* and holding that "the discretionary function exemption protects the Government from liability for claims premised on the lack of training, oversight, or qualifications of air-traffic controllers, since the Government acted within its discretion to contract those responsibilities out to Midwest.").

## *Comparative Negligence of Collins*

Collins owed a duty of reasonable care to Luscher and Hock while operating his aircraft. Collins breached the duty of reasonable care by failing to accurately identify his position upon approach of WRA. Collins' breach of his duty was a proximate cause of Plaintiffs' injuries and resulting damages. Collins' percentage of fault is five percent.

# ORDER

IT IS THEREFORE ORDERED that judgment be entered in favor of Defendant, the United States of America.

Based upon the admission of liability by Defendant, Midwest Air Traffic Control Services, Inc., and the March 8, 2007 Preliminary Order of Partial Findings, judgment is entered against Midwest Air Traffic Control Services, Inc. in the amount of $999,900.00.

Based on the March 8, 2007 Preliminary Order of Partial Findings, judgment is entered against: (1) Midwest Air Traffic Control Services, Inc. on its claims of contribution and/or comparative fault against the Estate of Sharon Hock; (2) Midwest Air Traffic Control Services, Inc. as to its affirmative defenses 1, 2, and 3; (3) the United States of America on its claims of comparative fault against the Estate of Hock; (4) the United States of America on its claims of comparative fault against the Estate of Luscher; (5) Midwest Air Traffic Control Services, Inc. and the United States of America on their claims of contributory fault against ATE of Illinois and Scott Chomicz.

Dated: September 28, 2007

JOHN W. DARRAH
United States District Court Judge

49